## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TROY ABRON, II  #418025**                              **CIVIL ACTION**

**versus**                                                      **NO. 05-876**

**BURL CAIN, WARDEN**                              **SECTION: "J" (1)**


### REPORT AND RECOMMENDATION

      This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Troy Abron, II, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On July 29, 1999, he was convicted of second degree murder in violation of La.Rev.Stat.Ann. § 14:30.1.[2]  On October 12, 1999, he was sentenced to a term of life imprisonment, without benefit of parole, probation, or suspension of sentence, with credit for time served.[3]  On May 30, 2001, the Louisiana Fifth Circuit Court of Appeal affirmed his conviction.[4]  He then filed with the Louisiana Supreme Court a petition for an application for a writ of certiorari[5] which was denied on June 7, 2002.[6]

On May 9, 2003, petitioner filed with the state district court an application for post-conviction relief.[7]  On May 14, 2003, the court denied petitioner's claims that he received ineffective assistance of counsel and that the prosecution withheld impeachment evidence regarding witness Spencer Williams; however, the court ordered that the state respond to petitioner's claim that the prosecution withheld impeachment evidence regarding witness Darnell Williams.[8]  Subsequently,

---

[2]  State Rec., Vol. V of VI, transcript of July 29, 1999, p. 7; State Rec., Vol. I of VI, minute entry dated July 29, 1999; State Rec., Vol. I of VI, jury verdict form.

[3]  State Rec., Vol. V of VI, transcript of October 12, 1999, p. 11; State Rec., Vol. I of VI, minute entry dated October 12, 1999.

[4]  State v. Abron, No. 01-KA-29 (La. App. 5th Cir. May 30, 2001) (unpublished); State Rec., Vol. IV of VI.

[5]  State Rec., Vol. IV of VI.

[6]  State v. Abron, 817 So.2d 1145 (La. 2002) (No. 2001-KO-1977); State Rec., Vol. IV of VI.

[7]  State Rec., Vol. IV of VI.

[8]  State Rec., Vol. IV of VI, Order dated May 14, 2003.

on October 14, 2003, the state district court denied petitioner's claims concerning Darnell Williams.[9]
On December 5, 2003, the Louisiana Fifth Circuit Court of Appeal denied a related writ application,
finding no error in the trial court's October 14 ruling.[10]  Petitioner then filed with the Louisiana
Supreme Court an application for a supervisory writ[11] which was denied on February 4, 2005.[12]

On March 7, 2005, petitioner filed this federal application for *habeas corpus* relief.[13]
In support of his application, he claims that his right to cross-examine Spencer Williams was
improperly restricted and that the state failed to fully disclose all inducements made to that witness
in exchange for his testimony.

In its original response in this matter, the state argued only that petitioner's federal
application was untimely filed.[14]  The Court subsequently ordered the state to file a supplemental
memorandum addressing the merits of petitioner's claims and any other defenses the state wished

---

[9] State Rec., Vol. IV of VI, Order dated October 14, 2003.

[10]  State *ex rel.* Abron v. Cain, No. 03-KH-1402 (La. App. 5th Cir. Dec. 5, 2003) (unpublished);
State Rec., Vol. IV of VI.

[11]  State Rec., Vol. IV of VI.

[12]  State *ex rel*. Abron v. State, 893 So.2d 90 (La. 2005) (No. 2004-KH-0225); State Rec., Vol.
IV of VI.

[13]  Rec. Doc. 1.

[14]  Rec. Doc. 3.

to raise.[15]  The state then filed a supplemental response arguing that petitioner's claims should be denied on the merits.[16]  Petitioner has filed memoranda in opposition to the state's memoranda.[17]

<u>Timeliness</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his conviction or sentence becomes "final."  Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.  28 U.S.C. § 2244(d)(1)(A).

As noted, on June 7, 2002, the Louisiana Supreme Court denied petitioner's writ application challenging the state intermediate appellate court's judgment affirming his conviction. For AEDPA purposes, his conviction became "final" ninety (90) days later, when his period expired for seeking a writ of certiorari from the United States Supreme Court.  <u>See</u> <u>Roberts v. Cockrell</u>, 319 F.3d 690, 694 (5th Cir. 2003); <u>Ott v. Johnson</u>, 192 F.3d 510, 513 (5th Cir. 1999); <u>Chester v. Cain</u>, Civ. Action No. 01-1958, 2001 WL 1231660, at *3-4 (E.D. La. Oct. 15, 2001); <u>see also</u> U.S. Sup. Ct. R. 13(1).  Accordingly, petitioner's one-period for seeking federal *habeas corpus* relief commenced

---

[15]  Rec. Doc. 4.

[16]  Rec. Doc. 5.

[17]  Rec. Docs. 8 and 9.

on September 5, 2002,[18] and expired one year later, on September 5, 2003, unless that deadline was extended through tolling.

The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court. 28 U.S.C. § 2244(d)(2). Two hundred forty-five (245) days of petitioner's one-year statute of limitations elapsed prior to being tolled by the filing of his post-conviction application on May 9, 2003.

Although that post-conviction application was denied, tolling continued uninterrupted during the period of appellate review, so long as petitioner sought such review in a timely manner. See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004). In the instant case, the state argues that tolling was interrupted because petitioner's related writ application

---

[18] The state argues that the statute of limitations commenced earlier because petitioner's writ application was untimely filed with the Louisiana Supreme Court. The record indicates otherwise.

Louisiana Supreme Court Rule X, § 5(a) provides: "An application seeking to review a judgment of the court of appeal ... after an appeal to that court ... shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal ...." In the instant case, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's conviction and sentence on May 30, 2001, and notice of that judgment was mailed that same date. State Rec., Vol. V of VI, certificate of mailing. Accordingly, petitioner had until Friday, June 29, 2001, to file his writ application with the Louisiana Supreme Court.

This Court acknowledges that the writ application in question was stamped by the Louisiana Supreme Court as filed on July 6, 2001; however, this Court is also aware that the "file stamp" applied by the Louisiana Supreme Court bears no relation whatsoever to the date that court actually receives such documents for filing. In the instant case, the writ application was signed by petitioner on June 21, 2002, and was mailed from the prison in an envelope bearing a postage meter stamp bearing a partially obscured date in June. Moreover, the envelope even bears a "receipt stamp," presumably applied by the Louisiana Supreme Court, evidencing actual receipt on June 25, 2001, well within the thirty-day period. State Rec., Vol. IV of VI.

was untimely filed with the Louisiana Supreme Court.[19]  This Court disagrees.  The Louisiana Fifth Circuit Court of Appeal denied relief on December 5, 2003.  Assuming that the notice of judgment was mailed that same day, petitioner had until January 5, 2004, to file his related writ application with the Louisiana Supreme Court.[20]  In the certificate of service on that application, petitioner certified that he mailed the application to the Clerk of the Louisiana Supreme Court on January 5, 2004.[21]  In light of that certification, the absence of any evidence from that state showing that the certification was false, and the recent ruling of the United States Fifth Circuit Court of Appeals holding that federal courts must apply the "mailbox rule" to such filings,[22] this Court finds that the writ application was timely filed with the Louisiana Supreme Court.  Accordingly, out of an abundance of caution, the Court finds that tolling continued until the Louisiana Supreme Court denied writs on February 4, 2005.

---

[19]  Rec. Doc. 3, p. 11, n.12.  In its summary of the procedural history of the case, the state also alleges that the related writ application was untimely filed with the Louisiana Fifth Circuit Court of Appeal; however, the state does not mention that contention in the section of its response discussing the timeliness of petitioner's federal application.  In any event, this Court notes that even if that application were untimely filed, it would make no difference in this case.  Petitioner would still be entitled to tolling for all but the nineteen days between November 13, 2003, the date on which his period for filing the application expired, and December 3, 2003, the date on which the application was allegedly filed.  See Grillette, 372 F.3d at 770 n.5; Melancon v. Kaylo, 259 F.3d 401 (5th Cir. 2001).  Even if petitioner were found not to be entitled to tolling for that nineteen-day period, his federal application would still have been filed well within his one-year federal statute of limitations.

[20]  Louisiana Supreme Court Rule X, § 5(a), provides in pertinent part:  "An application seeking to review a judgment of the court of appeal ... after that court has granted relief on an application for supervisory writs ... or after a denial of an application, shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal."  Because the thirtieth day, i.e. January 4, 2004, fell on a Sunday, the deadline was extended until the following day.  See La.C.Cr.P. art. 13; La.Rev.Stat.Ann. § 1:55.

[21]  State Rec., Vol. IV of VI.

[22]  Causey v. Cain, No. 04-30618, 2006 WL 1413490 (5th Cir. May 24, 2006).

At that point, petitioner had one hundred twenty (120) days of his one-year statute of limitations remaining. Because his federal application was filed only thirty-one (31) days later on March 7, 2005,[23] it was timely.

Standard of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but

---

[23] Petitioner signed the certificate of service on the supporting memorandum accompanying his federal *habeas corpus* application on March 7, 2005. Rec. Doc. 1. That date represents the earliest date that petitioner could have presented his application to prison officials for mailing and, therefore, the earliest date that this Court could deem his *habeas* petition to have been filed for statute of limitations purposes. Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).

> unreasonably applies it to the facts of the particular case. The focus
> of the latter inquiry is on whether the state court's application of
> clearly established federal law is objectively unreasonable, and we
> stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an
> unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

> On November 4, 1995, Roosevelt Lewis died as a result of a
> blunt force trauma to his head. ...
> Two witnesses to the crime, Spencer Williams and Darnell
> Williams, testified at trial. Through their testimony, it was developed
> that they, Troy Abron, and the victim were in the parking lot of
> Church's Fried Chicken Restaurant on the corner of the Westbank
> Expressway and Brown Street in Harvey on the night of November
> 4, 1995. Darnell Williams testified that while the victim and Spencer
> Williams were either talking or arguing, he observed the defendant
> approach the victim from behind and hit him in the head with "that
> wooden board that the Parish had put in the [neutral] ground." He
> then saw the defendant hit the victim two or three more times with
> the same board. He also saw Spencer Williams kick the victim
> several times before he and the defendant ran away. He further
> testified that the defendant returned a few minutes later and stole the
> victim's earring and tennis shoes. After recounting the events of
> November 4, 1995, Darnell Williams admitted he did not report the
> incident to the police that evening.
> Spencer Williams also testified he observed the defendant hit
> the victim with "a stick" and the defendant [sic] fall to the ground,
> though he denied kicking the victim or stealing any of his belongings.

He also admitted he did not give information to the police earlier because he was afraid of retaliation from the defendant.

Defendant's girlfriend at the time, Shantrell Jones, admitted that defendant had a pair of tennis shoes around the time of the incident that she had never seen. She also recalled defendant returned home late one evening, around the date of the murder, with injuries to his shoulder, knees and knuckles. He claimed he was injured in a fall from his bicycle while he was drunk.

Detective Ralph Saacks of the Homicide Division of the Jefferson Parish Sheriff's Office testified that, on the evening of November 4, 1995, he responded to a reported homicide in the parking lot of Church's Fried Chicken Restaurant on the Westbank Expressway at East Brown Road in Harvey. He observed a black male lying in the southeast corner of the parking lot. Detective Saacks found a two-inch by four-inch wooden stake, which he identified as the murder weapon, in the parking lot of an adjacent business. He also saw a hole in a grassy area of the median near the location of the body, which, he concluded, was probably caused by removal of the wooden stake.

Through further investigation, Detective Saacks learned that a convenience store, located across the canal from the parking lot where the victim was found, had a video surveillance tape from November 4, 1995. Detective Saacks showed still photographs he made from the tape to several eyewitnesses, including Darnell Williams. Williams identified a man named "Troy" as the person responsible for the victim's death.

Detective Saacks then compiled a photographic lineup, containing defendant's picture, and showed it to Darnell Williams. Williams identified the defendant as the person who hit the victim in the head with the wooden stake.

Dr. Susan Garcia of the Jefferson Parish Coroner's Office testified the victim was brought to her wearing only boxer shorts, jeans and socks. She concluded that he died of blunt trauma to the left side of his head, which most likely occurred from the use of a two-by-four wooden board or an object with those dimensions. Pamela Williams, a serologist with the Crime Lab of the Jefferson Parish Sheriff's Office, testified that, after performing tests, she concluded that the blood found on the ground where the victim was found and the blood on the wooden stake were consistent with the victim's blood type. Rhonda Nichols, a forensic scientist with the Louisiana State Police Crime Laboratory, testified, however, that the

latent fingerprint tests performed on the wooden stake did not reveal any fingerprints.[24]

<u>Petitioner's Claims for Relief</u>

Petitioner claims that his right to cross-examine Spencer Williams was improperly restricted and that the state failed to fully disclose all inducements made to that witness in exchange for his testimony.  On direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected petitioner's claims, holding:

> Defendant here specifically assigns as error that the trial judge improperly restricted his cross-examination of a key State witness. He cites as evidence that the trial judge sustained the State's objection to defense counsel's question to Spencer Williams, "And what did they tell you [to allay your fears]."  Prior to this question, according to the defendant, the witness indicated that he had been afraid to testify but that he met with detectives who allayed his fears. He argues that his Sixth Amendment rights to "be confronted with the witnesses against him" and to "confront and cross-examine the witness against him ..." were violated, as well as the right to impeach a witness for bias or interest.
>
> The record reveals that, though the trial judge did sustain the State's objection to the question, the judge allowed the defendant to question the witness regarding any promises made to him by the detectives: "Well, the defense has a right to ask whether or not any promises or anything of that nature was made.  So, overruled to that extent.  Go ahead.  You can answer."
>
> Citing <u>United States v. Bagley</u>, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), defendant argues, within the same assignment of error, that the State failed to fully disclose all inducements made to witness, Spencer Williams, and that failure violated his due process right to impeach Spencer, under <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  He argues that the State promised "something" to Spencer Williams in exchange for his testimony, though the State did not disclose what that "something" was.

---

[24]   <u>State v. Abron</u>, No. 01-KA-29, at pp. 1-3 (La. App. 5th Cir. May 30, 2001) (unpublished); State Rec., Vol. IV of VI.

- 10 -

The State must disclose to the defense favorable evidence that is material to guilt or punishment, which includes evidence impeaching the testimony of a witness whose reliability or credibility may determine the guilt or innocence of the accused. Brady v. Maryland; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The defense may challenge the witness' credibility by the introduction of extrinsic evidence of bias or interest, which includes evidence of the existence of a deal or agreement between the witness and the State whereby the witness receives a benefit or gain in exchange for his testimony. State v. Meyers, 97-2584 (La. App. 4th Cir. 11/24/99), 748 So.2d 554, writ denied, State ex. rel. Meyers v. State, 00-0598 (La. 11/3/00), 772 So.2d 663.

The defendant here has failed to prove that such a deal existed. The record reflects that the witness stated on cross-examination, "Well, they didn't promise me anything. And we didn't deal or anything. It was just a subject that needed to be handled." He later reiterated that the State did not promise he would not be arrested for this crime. Again, when defense counsel asked what the District Attorney's Office promised him "in reference to being prosecuted for second degree murder," Williams replied, "They didn't promise me anything." On redirect, the witness again indicated that no one from the District Attorney's Office or any other state agency told him he would be prosecuted for murder if he did not testify against the defendant. Furthermore, the prosecutor stated on the record, before the witness testified, and outside the presence of the jury, that the witness had concerns about testifying, relative to the possibility of his own prosecution but that he told the witness that he did not have any available information to suggest that the witness was the person who inflicted the fatal blow and that he was not the focus of any Jefferson Parish Sheriff's Office investigation. The assistant district attorney also stressed at trial that he had not granted the witness immunity from prosecution.

The witness did indicate on cross-examination, however, that the fact that he was told that he was not the target of the investigation led him to believe he would not be prosecuted in exchange for his testimony.

The defendant cites Giglio, supra, United States v. Bagley, supra, and State v. Bailey, 367 So.2d 368 (La. 1979) for his argument that a witness' mere impression that a deal or agreement has been offered must be disclosed. All three cases, however, are distinguishable from the scenario here.

In <u>Giglio</u>, an assistant prosecutor promised a government witness that he would not be prosecuted if he testified. A second prosecutor, who was unaware of the first prosecutor's promise, told the witness he would be prosecuted if he did not testify. He also told the witness that, if he agreed to testify, he would have to rely on the "good judgment and conscience of the Government" to determine whether he would be prosecuted. The Supreme Court found that the initial prosecutor's promise constituted reversible error. In dicta, the Court stated that the second prosecutor's statement "standing alone, contains at least an implication that the Government would reward cooperation of the witness, and hence tends to confirm rather than refute the existence of some understanding for leniency."

In <u>Bagley</u>, in response to a defense request, the Government did not disclose any deals, promises or inducements related to their two principal witnesses. After the defendant was convicted, and in response to a Freedom of Information Act request, he discovered the Government had failed to disclose documents signed by the witnesses in which the Government promised the witnesses money for their testimony. It was not until after the trial that the government officials signed the documents and wrote in a specific monetary amount. The Supreme Court found that, though the blank contracts did not constitute a "promise of reward," the prosecutor failed to disclose the possibility of reward, and this possibility gave the witness an interest in the outcome of defendant's trial.

<u>Bailey</u> is also distinguishable. In <u>Bailey</u>, the day before a witness testified at defendant's trial, he was arrested on a felony charge. An assistant district attorney arranged for the witness' release, without bail, so he would not be in custody when he testified. The Louisiana Supreme Court determined that, though the State never indicated to the witness that the charges against him would be dropped if he testified, the state's witness may have gained the impression that his testimony would help him in that regard. The Court noted that, had the defense been privy to this information, the witness' credibility might have been negated.

The situation before us is entirely distinguishable from these cases cited by the defendant. Here, there is no evidence the State promised not to prosecute the witness, threatened to prosecute him if he did not testify or offered him anything else of value in exchange for his testimony. He was simply informed that he was not the target of the investigation, which led the witness to believe he would not be prosecuted. Accordingly, we find defendant's sole assignment of error without merit. We, therefore, conclude the trial judge did not

err by improperly restricting the cross-examination of a key witness. Accordingly, we affirm the conviction.[25]

This Court finds no merit to petitioner's claim that he is entitled to relief because his right to cross-examine Spencer Williams was improperly restricted.  With respect to such claims, the United States Supreme Court has held:

> The Confrontation Clause of the Sixth Amendment guarantees the right of an accused  in a criminal prosecution "to be confronted with the witnesses against him."  The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, means more than being allowed to confront the witness physically.  Indeed, the main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*. Of particular relevance here, we have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.  On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.  And as we observed earlier in this Term, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.

Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986) (citations, internal quotation marks, and brackets omitted) (emphasis in original).  In order to prevail on such a claim, a petitioner must show that a reasonable jury might have received a "significantly different impression" of the witness' testimony if defense counsel had been permitted to pursue the proposed line of questioning.  Id. at 680; United States v. Maceo, 947 F.2d 1191, 1200 (5th Cir. 1991).  Additionally, even if such cross-

---

[25]  State v. Abron, No. 01-KA-29, at pp. 3-7; State Rec., Vol. IV of VI.

examination was improperly curtailed in violation of the Confrontation Clause, a petitioner is not entitled to relief if the error was ultimately harmless.  Van Arsdall, 475 U.S. at 680-84.

In the instant case, petitioner's claim is that defense counsel was improperly restricted in her attempt to cross-examine Spencer Williams on the issue of what promises or inducements he received to testify.  A review of the transcript shows otherwise.  Prior to Williams' testimony, a conference held on the record without the jury present.  It was made clear at that time that defense counsel would be allowed to cross-examine Williams fully on that issue:

MS. HUGHES [defense counsel]:

Your Honor, one last thing.  In as much as the representation was made on the record that the reason Mr. Williams was brought in here was so that all of the things could be presented before both Your Honor and myself in reference to our right to know of any deal.  I'll like the record to reflect that he did have – leave the room after the "on the record" dialogue to have a discussion with the District Attorney, and I'd like to know what that discussion was if it relates to any deal.

THE COURT:

You can ask him at the time whether or not any deals were made, whether they promised him anything or anything like that. You can cross-examine him.

MR. BATES [the prosecutor]:

Right.  Based on what I know about this case, if there is some concern about him testifying relative to his involvement or anything like that, I mean, if there is such as thing as use-immunity or derivative use-immunity that would be applicable to this witness's testimony, I will grant him that in lieu of having to stop or interrupt this witness's testimony.

THE COURT:

Well, let's see –

- 14 -

MR. BATES:

    I mean, like I said, I don't –

THE COURT:

    Have you granted him immunity at this stage?

MR. BATES:

    No, I have not.

THE COURT:

    Okay.  That's all.  You can question him about anything like that.[26]

The transcript further reflects that defense counsel did in fact exhaustively cross-examine Williams on that issue, and Williams repeatedly denied that there were any promises or inducements.  For example, the transcript reflects the following lengthy exchange:

    Q.    Did you discuss with the detectives your fear of being arrested and prosecuted for this crime?

    A.    Yes.

    Q.    And what did they tell you?

MR. BATES:

    Objection.

BY MS. HUGHES:

    Q.    Did they promise –

---

[26] State Rec., Vol. VI of VI, transcript of July 28, 1999, pp. 45-47.

THE COURT:

      Sustained.  Rephrase your question.

BY MS. HUGHES:

Q.     Okay.  Did they promise you that you wouldn't be prosecuted if you came forward?

MR. BATES:

      Objection.  Calls for a hearsay response.  She can – I believe the appropriate question would be what was his impression as a result of the conversation.  But, I would object, cause it would necessarily call for a hearsay response on the part of the witness.

THE COURT:

      Well, the defense has a right to ask whether or not any promises or anything of that nature was made.  So, overruled to that extent.  Go ahead.  You can answer.

BY MS. HUGHES:

Q.     What did the detectives tell you in regard to whether you would be prosecuted or not, or your fear of being prosecuted?

A.     Well, they didn't promise me anything.  And we didn't deal or anything.  It was just a subject that needed to be handled.

Q.     Well, you told them this is a subject that needs to be handled and then they didn't handled it and you're here?

A.     No.  The subject was Troy.  They had to deal with it.  So, I was implicated and came into the situation.  And when they found me, we just had discussions, a brief discussion, about what happened that night.  That's what it was all about, what happened that night.  What went on.  You know what I'm saying?  And who did the hitting and stuff like that.  That's what it was all about.

....

Q.      Okay.  Now you're saying that you told them that you had a
concern about being arrested for the crime?

A.      Yeah.

Q.      And they just said:  Well we're not dealing with that.  Is that
what you're telling this jury?

A.      No, they didn't say they wasn't dealing with it.

Q.      Well, what did they tell you they were going to do about your
fear of being arrested and implicated in a murder?

A.      They said that –

MR. BATES:

        Objection.   Now that does not go to any promises or
inducement for coming forward.

THE COURT:

        Sustained.   Just ask – you can ask whether or not any
promises were made or anything was done for him.  I'll let you go
into that, but not exactly what was said.

BY MS. HUGHES:

Q.      Did they promise you that if you came forward that you
wouldn't be arrested for the crime that you placed yourself on
the scene of?

A.      No.  No.

Q.      They just told you:  Just come in here and just take your best
shot.  You may be arrested after you finish testifying.

A.      No.  No.

Q.      Is that what you want this jury to believe?

A.      No.  It's not –

- 17 -

MR. BATES:

        Objection.  Argumentative, Your Honor.

THE COURT:

        Overruled.  Go ahead.  You can answer.

THE WITNESS:

        It's not exactly what I want the jury to believe.  You know.  It's what's going on right now.

BY MS. HUGHES:

Q.     Okay.  So, you're telling the jury that you have absolutely no idea whether at the conclusion of your testimony at this trial whether you'll be arrested and prosecuted as a principle [sic] to a second degree murder?

A.     Hold up.  You can ask that question again?

Q.     Are you saying that nobody has given you any direction as to whether or not after you testify today whether you'll be arrested and prosecuted for being a principle [sic] to a second degree murder.

A.     Exactly.

Q.     Okay.  And have you had conversations with the District Attorney's Office about your concerns and your fear of prosecution of this case?

A.     Only when they called.  They called probably about twice.  And we just had the same discussion.  It was all about the same discussion.

Q.     And what did you discuss with them about what they would promise you in reference to you being prosecuted for this second degree murder?

A.     They didn't promise me anything.

Q.      Okay.  So, again, they said:  Just take your best shot.  Get on the stand and we'll see what we will see.

A.      I don't know what's going to happened.[27]

As is evident from the foregoing, petitioner's defense counsel was not improperly restricted in her attempt to cross-examine Spencer Williams on the issue of what promises or inducements he received to testify.

This Court likewise finds no merit in petitioner's related claim that his rights were violated because the state failed to fully disclose all inducements offered to Spencer Williams in exchange for his testimony.  That claim is based on <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.  Regarding <u>Brady</u> claims, the United States Fifth Circuit Court of Appeals has stated:

> <u>Brady</u> requires the state to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.
>      Under <u>Brady</u>, to establish that the state has breached this duty, the defendant must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment.   This duty extends to both exculpatory and impeachment evidence.

<u>DiLosa v. Cain</u>, 279 F.3d 259, 262-63 (5th Cir. 2002) (internal quotation marks and citations omitted).  <u>Brady</u> claims present a mixed question of law and fact.  <u>Trevino v. Johnson</u>, 168 F.3d 173, 184 (5th Cir. 1999).  Therefore, this Court is required to defer to the state court's decision rejecting petitioner's <u>Brady</u> claim unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

---

[27]  State Rec., Vol. V of VI, transcript of July 28, 1999, pp. 70-74.

As an initial matter, this Court notes that petitioner has produced nothing to show that promises or inducements were in fact offered to Williams or that evidence of that fact was withheld from the defense.  That is, in and of itself, fatal to petitioner's claim.  See Harris v. United States, 9 F.Supp.2d 246, 275 (S.D.N.Y. 1998) ("[T]he government does not bear the burden of establishing that documents were not withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [him].), aff'd, 216 F.3d 1072 (2nd Cir. 2000); see also United States v. Avellino, 136 F.3d 249, 261 (2nd Cir. 1998); Cruz v. Artuz, 97-CV-2508, 2002 WL 1359386, at *14 (E.D.N.Y. June 24, 2002).  Moreover, as the portions of the transcript previously quoted reflect, all evidence indicates that no promises or inducements were offered in exchange for Williams' testimony.

For the foregoing reasons, this Court finds that petitioner has failed to demonstrate that the state court's decision rejecting petitioner's Brady claim was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects claim.

### **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Tony Abron, II, be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this sixteenth day of June, 2006.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**